# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| **GWENDOLYN WILKERSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Cause No.: 2:08-CV-26** |
| ) | |
| **MENARD, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

This matter is before the court on the motion for summary judgment filed by the

defendant, Menard, Inc., d/b/a Menards ("Menards") on February 13, 2009. Docket at 24. The

plaintiff, Gwendolyn Wilkerson ("Wilkerson") filed a response in opposition to the motion on

March 15, 2009 (docket at 27) and Menard filed a reply brief on March 30, 2009 (docket at 28).

For the reasons discussed below, the motion for summary judgment is GRANTED and this case

is DISMISSED.

## FACTUAL BACKGROUND

On March 5, 2007, Wilkerson, an African-American, attended a job fair held at the

Indiana University Northwest campus in Gary, Indiana. Menards, a Wisconsin-based

corporation that operates a popular chain of home improvement retail stores in Indiana and other

locations throughout the United States, was present at that job fair. The company was

represented by Anne Hammersmith, Menards Store Operations Human Resources Recruiter, and

Veronica Reyes, Human Resources Coordinator at the Menards retail store in Merrillville,

Indiana. During the course of the job fair, Wilkerson visited the booth that Menards had set up,

at which the company displayed general information about the corporation and its various

employment programs.  Hammersmith gave Wilkerson a one-page document that included

information about a Human Resource Coordinator position ("job description").  That document

included a description of the company, compensation and benefits information pertaining to the

Human Resource Coordinator position, and the required qualifications for the position.  One of

the qualifications listed, and the one that is at the heart of the dispute in this case, was the degree

requirement.  That provision stated that a person wishing to apply for the position must have a

"Bachelor's Degree in Human Resource Management or Business Management (or

Administration) with a focus or emphasis in Human Resources."  Memorandum of Law in

Support of Defendant Menard, Inc.'s Motion for Summary Judgment ("Defendant's

Memorandum"), docket at 26, p. 2; Defendant's Exhibits, docket at 26-2, Exhibit 1.  The job

description also included instructions directing persons who might be interested in the position to

"Mail, Email, or FAX cover letter and resume to: Anne Hammersmith . . . ."  *Id*.  Despite the

existence of this job description, Menards maintains that its company presence at the job fair

merely "served as an informal 'meet-and-greet' where job seekers in attendance have an

opportunity to collect general information and learn about the types of positions available at

Menards."  *Id*., p. 1 (citing Deposition of Michael Hilfiker, Defendant's Exhibit 9).[1]  Menards

further maintains that "[a]t the time of the job fair Menards was not specifically looking to fill

any Human Resource Coordinator positions."  *Id*. (citing Deposition of Anne Hammersmith,

Defendant's Exhibit 10).  Menards contends that "[a]n individual attending a job fair who is

interested in a position with Menards cannot apply for a position at the job fair[.]," that "Ms.

_____

[1] Hilfiker is the "Menards Store Operations Human Resource Director[.]" Defendant's
Memorandum, p. 4.

Hammersmith did not provide applications for employment at the job fair nor does she have the authority to make hiring decisions[.]," and that "Wilkerson did not apply for a position with Menards" at the job fair. *Id*., p. 2 (citing Hilfiker deposition, Hammersmith deposition and Deposition of Gwendolyn Wilkerson (Defendant's Exhibit 8)).

When Wilkerson visited the Menards exhibit at the job fair, she handed Hammersmith "a one-page resume and one-page document titled "Comments from Workshops Presented by Gwendolyn Wilkerson." *Id*., Defendant's Exhibit 2. Wilkerson's resume stated that she had a "Bachelor of Science in Management from Indiana Wesleyan University" and that she had taken courses in "Executive Management, Supervision, Human Resources, Customer and Employer/Employee Relations and Conflict Resolution." *Id*. The remainder of Wilkerson's resume, while impressive, makes no mention of any work experience in the field of human resources. *Id*. Thus, the only reference the resume makes concerning human resources is the fact that Wilkerson took a course or courses dealing with the subject.

On March 16, 2007, Wilkerson sent an e-mail to Hammersmith, in which she indicated that she was interested in the Human Resource Coordinator position that was explained in the job description. Defendant's Exhibit 3. Wilkerson's e-mail read, in its entirety, as follows:

> Hi Anne Hammersmith:
>
> It was a pleasure speaking with you on March 5, 2007 at the job fair held at Indiana University Northwest in Gary, Indiana.
>
> At the fair you gave me a job description of Human Resource Coordinator. I am very interested in this position.
>
> Do you have any positions available in Indiana (Merrillville, Schererville, Valparaiso, Hammond, Highland, Gary)?
>
> I provided you with a resume and comments from various workshops I presented.

However if you would like for me to forward another set I will do so.

Once again, it was a pleasure speaking with you.  Thank you for your time.

Gwen Wilkerson

*Id*.  On March 18, 2007, Hammersmith responded to Wilkerson's e-mail via a return e-mail,

which read in its entirety as follows:

Gwen,

Good Evening.  Unfortunately, for our Human Resource Coordinator positions we do require a Human Resource Management degree.  Thank you for your interested [sic] and good luck in all of your endeavors.

Sincerely,

Anne Hammersmith
Menards, Inc.
Operations Human Resources Recruiter

*Id*.  The following day, March 19, 2007, the two women again had an exchange of e-mails.  This

exchange read as follows:

Hi Anne Hammersmith:

This is Gwen Wilkerson again who you met at the job fair at Indiana University Northwest on March 5, 2007.  Your email stated I had to have a degree in Human Resource Management.

I looked at the job description again and it says a Bachelor's Degree in Human Resource Management or Business Management (or Administration).  My degree is in Business Management.

Please clarify.  Thank you.
. . .

Gwen,

Hello.  It has to be in Human Resource Management.

Anne

*Id.* (page two).

Displeased with Hammersmith's response, Wilkerson wrote a letter to Larry Menard in Eau Claire, Wisconsin, the Operations Manager for the corporation.  Defendant's Exhibit 4.  In that letter, Wilkerson explained that she visited the Menards booth at the job fair, gave Hammersmith her resume, and received a copy of the Human Resources job description.  *Id.*  Wilkerson also summarized the e-mail exchanges she had with Hammersmith.  *Id.*  Wilkerson then wrote as follows:

> The job description **CLEARLY** states Bachelor's Degree in Human Resource Management or Business Management (or Administration).  My resume also stated I had extensive coursework in Human Resources and I possess all of the other listed requirements.
>
> I should have never been given a job description with explicit guidelines only to be told what is on the job description is not what it really says, when it is unquestionably clear.
>
> There is no logical explanation for this conduct exuded by Anne Hammersmith and I don't believe this is the type of activity Menards condones.  This behavior is totally against guidelines of the U.S. Equal Employment Opportunity Commission.
>
> I am therefore, asking you to respond to this initial letter.  Thank you for your time.

*Id.* (emphasis in original).  Michael Hilfiker responded to Wilkerson's letter in a letter dated March 31, 2007.  Defendant's Exhibit 5.  Hilfiker's response stated as follows:

> Ms. Wilkerson
>
> I am in receipt of your letter and would like to thank you for your interest in a career with Menards.
>
> According to Menards Human Resource Coordinator position description, a successful candidate will possess a Bachelor's Degree in Human Resource Management or a Bachelor's Degree in Business Management (or Administration) with a focus or emphasis in Human Resources.

Please mail a copy of your resume and transcripts for my review.  If you meet our qualifications, I will forward your information to a store with an open Human Resource Coordinator position.

Thanks again for your interest in a career with Menards!

While Wilkerson acknowledges that she received this letter, she also admits that she did not forward her resume or transcripts to Hilfiker, nor did she make any further attempts to contact him or any other representative of Menards to follow up on the matter.  Defendant's Exhibit 8, Wilkerson Deposition, pp. 28-29.  When asked during her deposition why she did not send her resume or transcripts to Hilfiker and why she made no further attempt to contact anyone at Menards after receiving Hilfiker's letter, Wilkerson stated that "[w]hen I received his letter I was already crushed."  *Id.*, p. 31.  In her brief in opposition to the motion for summary judgment, Wilkerson elaborates on this point, and her apparent state of mind after she received Hilfiker's letter, by stating that she believed that Hammersmith "misrepresented the job qualifications and essentially informed Wilkerson that she would not be considered for a [sic] HRC position. Wilkerson was appalled by Hammersmith's misrepresentation and mailed a letter to Larry Menard explaining the situation and seeking an explanation. . . . [Hilfiker's letter] provided no explanation for Hammersmith's misrepresentation, no apology and no assurance that Menard was in fact an equal opportunity employer.  Wilkerson did not respond to Hilfiker's letter.  As a result of her dealings with Hammersmith and Hilfiker, Wilkerson believed she was not welcome at Menard because of her race and saw no point in pursuing the HRC position further." Plaintiff's Brief, p. 8.  Finally, it is undisputed that Wilkerson never formally applied for any position with Menards, either during the job fair or at any time after.

On May 21, 2007, Wilkerson filed a Charge of Discrimination against Menards with the

Indianapolis office of the EEOC.  Defendant's Exhibit 6.  In that Charge, Wilkerson alleged that

Menards had discriminated against her on the basis of her race as a result of the facts just

summarized.  Wilkerson filed the present lawsuit on January 25, 2008, alleging race

discrimination in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981.  Complaint, docket at 1.[2]

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53 (1986).  The standard for

granting summary judgment mirrors the directed verdict standard under Rule 50(a), which

requires the court to grant a directed verdict where there can be but one reasonable conclusion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).  A scintilla of

evidence in support of the non-moving party's position is not sufficient to successfully oppose

summary judgment; "there must be evidence on which the jury could reasonably find for the

plaintiff."  *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v.*

---

[2]  Wilkerson filed her Complaint *pro se*.  On March 13, 2008, Wilkerson's attorney filed
a notice of appearance on her behalf and has represented her since.

*Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56©, but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988); *Guenin v. Sendra Corp.*, 700 F. Supp. 973, 974 (N.D. Ind. 1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 (1983).

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249-251, 106 S. Ct. at 2511. In the context of employment discrimination cases, "[i]f the employee succeeds in casting doubt on the proffered reasons for dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider." *O'Connor v. DePaul University*, 123 F.3d 665, 670 (7th Cir. 1997). Summary judgment is particularly inappropriate

for resolving issues involving intent or motivation.  *Connor v. Reinhard*, 847 F.2d 384, 393-94

(7th Cir.), *cert. denied*, 488 U.S. 856 (1988).

## DISCUSSION

It is clear to the court that this case arose largely as a result of an apparent

misunderstanding or, perhaps, a semantical argument.  That misunderstanding led to this lawsuit,

which in turn is based solely and completely on Wilkerson's conclusory allegations and

speculation.  Wilkerson fails to present sufficient evidence to sustain her burden of establishing a

*prima facie* case of discrimination.

To make out a *prima facie* case of discrimination  for failure to hire under the framework

articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), a plaintiff must show

that (i) she is a member of a protected class; (ii) she applied and was qualified for a job for which

the employer was seeking applicants; (iii) despite her qualifications she was rejected; and (iv)

the defendant granted the job to someone outside the protected class who had similar or lesser

qualifications.  *See Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999);

*Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1032 (7th Cir. 1998).[3]  Wilkerson can

satisfy only the first prong of the *prima facie* test.  Even assuming, for the sake of argument,

Wilkerson was somehow able to sustain her burden, she fails to present any evidence whatsoever

---

[3]  Wilkerson could also attempt to prove her claims by presenting direct evidence of discrimination, in which case she would not have to meet her burden of establishing a *prima facie* case under *McDonnell Douglas*.  At one point in her response brief, Wilkerson claims to do just that–present direct evidence of intentional race discrimination.  Wilkerson's argument on this point is not well taken, as will be discussed below.  Because the court concludes that Wilkerson does *not* present any direct evidence of discrimination, the greater portion of the court's analysis of her claims is addressed within the context text of the long-established *McDonnell Douglas* framework.

that Menards' proffered reason for not hiring her was a pretext for discrimination.

As an African-American, Wilkerson is obviously a member of a protected class. However, she concedes that she did not apply for the Human Resources position with Menards (or any other position with the corporation for that matter)[4]; she has not presented evidence that she was qualified for the position;[5] she has not proven that she was ever rejected for the position; and she presents no evidence that a person outside of the same protected class who had the same or lesser qualifications received the job she allegedly desired.

Menards contends that "Wilkerson's claims consist of broad, speculative, and unsupported allegations, none of which would allow a reasonable jury to conclude that she was not considered for a Human Resource Coordinator position because of her race. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) (statements that amount to 'mere speculation as to the thoughts of the decision maker [are] irrelevant to an inquiry of discrimination"; *Mills* [*v. First Federal Savings & Loan Assoc.*], 83 F.3d [833,] at 841-42 [(7th Cir. 1997)] (subjective beliefs on part of the plaintiff are insufficient to create a genuine issue of material fact and will not defeat summary judgment)." Defendant's Memorandum, p. 8. The court agrees with Menards' legal and factual position.

---

[4] Wilkerson maintains that it was not necessary for her to apply for a job with Menards in order to pursue her claims. More on that later.

[5] There is a factual dispute concerning whether Wilkerson was qualified for the position or, more to the point, what exactly those qualifications were. But this factual dispute does not save Wilkerson's claims, as discussed later in this Opinion and Order.

Wilkerson clearly expressed her interest in a Human Resource position with Menards, both during the job fair and a few days after it when she sent her e-mails to Hammersmith. But by her own admission, she never applied for that job or any other job at Menards. Her exchange of e-mails with Hammersmith obviously created confusion or a misunderstanding concerning the precise qualifications required for such a position. As already stated, the job description that Hammersmith gave Wilkerson stated that the educational requirements for the job included a "Bachelor's Degree in Human Resource Management or Business Management (or Administration) with a focus or emphasis in Human Resources." As also discussed above, Wilkerson's resume stated that she had a "Bachelor of Science in Management from Indiana Wesleyan University" and that she had taken courses in "Executive Management, Supervision, Human Resources, Customer and Employer/Employee Relations and Conflict Resolution." The e-mails Hammersmith sent to Wilkerson make it clear that at least Hammersmith did not consider Wilkerson's B.S. in Management to be the same as a degree in Human Resource Management or Business Management or Administration *with a focus or emphasis in Human Resources*. Menards, or at least Hammersmith, drew a distinction between a bachelor's degree in human resources–or management with a focus in human resources–and Wilkerson's degree in management alone. Wilkerson argues that her degree in management is the same or essentially the same as the degree requirements in the job description. Furthermore, as her letter to Larry Menard makes clear, she believes that the fact that she took classes in "human resources" (among many others) while pursing her bachelor's degree constitutes a "focus or emphasis in Human Resources." In short, Wilkerson believes that her qualifications met those listed on the job description.

As discussed previously, Wilkerson, in her letter to Larry Menard, stated that she met the educational requirements for a human resource coordinator position when she wrote as follows:

> The job description **CLEARLY** states Bachelor's Degree in Human Resource Management or Business Management (or Administration). My resume also stated I had extensive coursework in Human Resources and I possess all of the other listed requirements.
>
> I should have never been given a job description with explicit guidelines only to be told what is on the job description is not what it really says, when it is unquestionably clear.

Defendant's Exhibit 4 (emphasis in original). But this part of Wilkerson's letter leaves out a portion of the relevant sentence from the job description, which actually states the requirements as "Bachelor's Degree in Human Resource Management or Business Management (or Administration) *with a focus or emphasis in Human Resources*." Defendant's Exhibit 1 (italics added). Wilkerson's resume, on the other hand, only states that she has a "Bachelor of Science in Management" and that she took a course or courses in "Human Resources" among many other subjects.[6] Defendant's Exhibit 2. Her resume does *not* indicate that Wilkerson's educational background had any "focus" or "emphasis" in human resources, which could, at least arguably, explain why Hammersmith felt she was not qualified for a Human Resource Coordinator position. Also, as Menard's points out, Wilkerson expressly stated in her letter to Larry Menard that she had a "degree . . . in Business Management." Defendant's Exhibit 4. However, the company notes that when it received a copy of Wilkerson's college transcript in the course of discovery, that transcript indicated that her degree was "a Bachelor of Science in

---

[6] Wilkerson's resume lists "human resources" as the subject of a course or courses (the resume does not state whether it was one course, two courses, or more) she took at Indiana Wesleyan. Defendant's Exhibit 2.

'Management[.]'" rather than "business management." Defendant's Memorandum, p. 3. And, the company notes, Wilkerson's resume states the same thing, i.e., that she has a B.S. in "management" rather than a B.S. in *business* management. Once again, this could be only a matter of semantics. But how was Menards to make that determination once Wilkerson chose not to forward a copy of her transcript after Hilfiker invited her to do so? Is a bachelor's degree in management with at least some course work in human resources the same as a bachelor's degree in human resource management or business management with a focus or emphasis in human resources? Certainly the terms "bachelor's degree," "business," "management," and "human resources" appear on both the job description *and* Wilkerson's resume. But for whatever reason, Hammersmith sent Wilkerson e-mails informing her that her qualifications did *not* meet those of the human resource position in which she was expressing interest. This is a fact issue but, as it turns out, it is not a material one.

Wilkerson's letter to Larry Menard makes it clear that she felt she had been the victim of discriminatory treatment simply as a result of Hammersmith's e-mails, based on the apparent difference of opinion or interpretation of the terms used in the job description and Wilkerson's resume. Be that as it may, Hilfiker responded to the letter and invited Wilkerson to forward another copy of her resume and a copy of her college transcript. Hilfiker reiterated that a human resource coordinator position with Menards required the specific degrees listed in the job description. Defendant's Exhibit 5. However, Hilfiker also expressly stated that he would review those documents and "[i]f you meet our qualifications, I will forward your information to a store with an open Human Resource Coordinator position." *Id*. In other words, he did not close the door on the possibility that Wilkerson was, after all, qualified for the position. Wilkerson

concedes that she did not avail herself of the invitation extended by Hilfiker's letter, since she was "already crushed" by what she perceived as discriminatory treatment.

Menards argues that Wilkerson cannot establish her *prima facie* case of discrimination since: 1) she never applied for any position with Menards but merely *inquired* about one (Defendant's Memorandum, p. 9); 2) Wilkerson's qualifications did not meet the requirements of the job in which she expressed interest (*Id.*, p. 10); 3) Wilkerson, as a result of the two factors just listed, was never rejected for any position with Menards (*Id.*, p. 11); and 4) Wilkerson presents no evidence that white candidates with the same or lesser qualifications were given such jobs (or treated more favorably in some other manner) (*Id.*, p. 12). Finally, Menards argues that even if Wilkerson could succeed in establishing her *prima facie* case, she "is unable to show any evidence that the degree requirement for the Human Resource Coordinator position is a lie or that the actions taken by representatives of Menards demonstrate a racial animus against her." *Id.*, p. 14.

In her response brief, Wilkerson first argues that the fact that she never actually applied for a position with Menards is irrelevant to the inquiry. Plaintiff's Response, p. 8. In support of her argument, Wilkerson cites several cases in which courts have found that plaintiffs can maintain claims of discrimination based on a failure to hire where the defendant company somehow made it clear that it would be futile for certain individuals to apply for work. *Id.*, pp. 8-10. For example, Wilkerson relies primarily on the case of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Wilkerson quotes the following passages from that case:

> The effects of and the injuries suffered from discriminatory employment practices
> are not always confined to those who were expressly denied a requested

employment opportunity.  A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.  The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices[,] by his discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.

Plaintiff's Response, p. 9 (quoting *Teamsters*, 431 U.S. at 365-66).  Based on this and a few other cases[7] which discuss the *limited* circumstances under which non-applicants may be able to pursue discrimination claims on a failure to hire basis, Wilkerson concludes that in her particular instance, "the lack of a formal application [to Menards] is not determinative."  *Id*.  But the present case is easily distinguished from the cases Wilkerson cites.  In this case, nothing prevented Wilkerson from formally applying for a position with Menards.  In fact, as stated, she was *invited* to do so by Hilfiker.  Her failure was not due to procedures or practices on the part of Menards that were intended to prevent minorities from applying for jobs.  She simply chose not to do so because she subjectively believed that to do so would be futile because she is African-American.

---

[7] The other cases cited by Wilkerson in support of this argument include *Babrocky v. Jewell Food Company*, 773 F.2d 857, 866-68 (7th Cir. 1985) ("[b]ecause an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless, even nonapplicants can in appropriate circumstances qualify for relief under Title VII."); *Loyd v. Phillips Brothers*, 25 F.3d 518, 523 (7th Cir. 1994) (where "plaintiff is deterred from applying" for a position and can show that he would have applied but for the defendant's discriminatory practices, "a preliminary link between discrimination and adverse consequence is established."); and *Coleman v. City of Chicago*, 2003 WL 22057018 (N.D. Ill.) (the failure to submit an application for a job can be excused if the plaintiff is deterred or prevented from applying by the challenged discriminatory practices).  Plaintiff's Response, p. 9.

One of the most stark differences between the present case and the *Teamsters* case on which Wilkerson relies is the fundamental fact that the *Teamsters* case was a "pattern and practice" case. That is, the United States filed suit against the Union and an employer alleging a pattern of discriminatory treatment against African Americans and Hispanics. The Supreme Court held that the government did not have to demonstrate that each and every individual who may have been harmed by the discriminatory practices had actually applied for a job and been rejected. Instead, the Court held that once a pattern of discriminatory practice had been established, a case of intentional discrimination could move forward. Once the issue of liability was resolved, the trial court could turn its attention to assessing what damages, if any, were sustained by individual employees or prospective employees. *Id*. at 361-62. The present case is a disparate treatment case, not a disparate impact case.

Similarly, in the *Babrocky* case, the defendants–also a company and a union–systematically prevented women from applying for certain positions. This pattern and practice of discriminatory hiring and promotion was pervasive and female employees knew full well the futility of applying for certain positions or promotions. *Babrocky*, 773 F.2d at 867. Consequently, the Seventh Circuit held that even employees who did not apply for certain positions could maintain claims that they were the victims of intentional discrimination. Likewise, in the *Loyd* and *Coleman* cases, the defendant employers allegedly had in place hiring and/or promotional practices that systematically excluded women (in the *Loyd* case) and African-Americans (in the *Coleman* case). In both cases, the courts concluded that it was not necessary for a plaintiff alleging discrimination for a failure-to-hire to prove that she had actually applied for an open position if the plaintiff could show that to do so would be futile. But that is

not what happened to Wilkerson in this case. Instead, Wilkerson merely *assumed* that it was

futile for her to send her resume and transcript to Hilfiker based on her own interpretation of

information she found on the internet, which will be addressed in a moment. Menards was not

refusing to accept Wilkerson's resume nor was Wilkerson aware of any ingrained policy or

practice on the part of Menards that she can legitimately argue prevented her from applying for a

position with the company. Thus, her argument that she should be excused from not having

formally applied for a position is without merit. She was invited to do so and she refused,

believing (subjectively) that there was no point.

      Wilkerson claims that her failure or refusal to send Hilfiker her resume and transcripts

was based, at least in part, on research she says she conducted on the internet and an article she

read. In her deposition, when asked why she felt she had been discriminated against on the basis

of her race, Wilkerson testified as follows:

> A.: After looking at research about Menards and looking at the corporate culture
> and everything that went along with that, the various other lawsuits about
> discrimination, the federal government having to subpoena their records because
> they refused to turn in their Affirmative Action reports and their hiring practices,
> and it was a combination of a number of things to let me know that this was
> Menards corporate culture; and all of the research and documentation I viewed,
> just verified my ideology about Menards.

> Q.: When you said you looked at some research, can you explain what you looked
> at?

> A.: Well, along with the one that I just fore-stated [sic], not turning in–I mean
> having to have their records subpoenaed by the federal government, solely
> because you weren't turning in the reports that you're required to turn in. If you
> visit Menards' website they have nothing on there about their Affirmative Action,
> an equal employment opportunity employer, because I believe they don't intend
> to be. They don't have to be. And I read an article that was published in
> the–what's it called–*Milwaukee Big Money* about John and Larry Menard and just
> the type of people they are, and then the comments from past, present employees
> and the way that they treated them and all of them are white. So if they treated

their white employees like that, what will they think about an African American. And then to receive a report where out of 200 human resource coordinator positions in approximately 15 states you have 11 African Americans, this is out of 200–I think it was 220 positions–you have 11 African Americans–two of which were hired after I filed the lawsuit–eight Hispanics and three Asians. It was just a number of things to let me know about the corporate culture.

Defendant's Exhibit 8, Wilkerson Deposition, pp. 34-35. During her testimony, Wilkerson refers to what she calls her "ideology about Menards," her perception of Menards' "corporate culture," her "belie[f]" that Menards does not "intend" to be an equal opportunity employer, and how her internet research "let me know about the corporate culture." It is clear from her own testimony that Wilkerson assumed that Menards was engaged in discriminatory employment practices. But his was her own conclusion and was based on her own interpretation of information she gleaned on the internet. It was *not* the result of anything Menards did to her. Nonetheless, she couches her opinions, speculation and conclusions as evidence, which they are not.

Menards argues that "Wilkerson has failed to establish any evidence that she was discriminated against on the basis of her race. Wilkerson was not rejected for a Human Resource Coordinator position, but now asks this Court to infer that she was rejected for a position she never actually applied for solely because of her race. Other than Wilkerson's unsupported speculation and feeling, Wilkerson has produced no evidence that Menards' actions exhibit a discriminatory animus toward her or that her race was at issue." Defendant's Reply, p. 9.

Wilkerson also uses certain statistics in an attempt to demonstrate discriminatory hiring policies on the part of the defendant. In her deposition, Wilkerson refers to a report provided to her by Menards during discovery. Plaintiff's Response, Exhibit D. This document, according to Wilkerson, proves that "an inference [of race discrimination] is supported by the fact that Menard, between late-2002 and mid-2008, hired 231 [Human Resource Coordinators] but only

11 (.047%) of them are African American. Such a stark statistical disparity, showing a substantial under-representation of African Americans, shows a *prima facie* case of intentional discrimination and requires the defendant to dispel the inference." *Id.*, p. 13 (citing *Castaneda v. Partida*, 430 U.S. 482, 494-95 (1977)).[8]

Menards refutes this argument by arguing that "Wilkerson's math is a bit fuzzy." Defendant's Reply, p. 5. Menards maintains that "[n]ot only are the percentage calculations provided by Wilkerson wrong, but [by] drawing from a chart provided by Menards during discovery Wilkerson misrepresents the number of Human Resource Coordinators that were currently employed by Menards as of July 28, 2008 as a figure representing the number of African Americans that were hired by Menards from 2002 through 2008. The information provided by Menards during discovery represents the current list as of July 28, 2008 for the Human Resource Coordinators employed by Menards; this information is not a complete list of

---

[8] Wilkerson argues that the e-mail "rejections" she received from Hammersmith and the Menards' report listing its total number of human resource coordinators (and their race) constitutes "sufficient direct evidence to support a finding of intentional race discrimination." Plaintiff's Response, p. 14. The court disagrees with Wilkerson's characterization of this evidence as "direct evidence." As Menards correctly points out, "direct evidence" of employment discrimination is "evidence, which if believed, would prove existence of fact without any inferences or presumptions." Defendant's Reply, p. 8 (citing *Cowan v. Glenbrook Sec. Serv. Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)). The statistical document which Wilkerson characterizes as "direct evidence" of intentional discrimination does not support such a conclusion absent an inference by a jury that it proves a pattern and practice on the part of Menards. Even the Supreme Court in the *Teamsters* case, while acknowledging the validity of using statistical evidence as one type of evidence to prove discrimination (albeit in disparate impact cases) stated: "We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340 (citation omitted). In the present case, Menards has refuted the statistics by presenting evidence that they are not indicative of the racial makeup of the company's Human Resource Coordinators, at least in the stores located in the region in which Wilkerson expressed interest in working.

all the Human Resource Coordinators hired from 2002 through 2008."  Defendant's Reply, p. 5.
In addition, Menards is quick to point out that "all of these candidates submitted their academic
transcripts and applied for a position with Menards prior to being considered for a Human
Resource Coordinator position."  *Id*. (citing Affidavit of Terri Jain, Defendant's Reply, Exhibit
1).[9]  Furthermore, Menards notes that "[o]f the . . . eight . . . Human Resource Coordinators
selected by Wilkerson, one is an African-American female, one is a Hispanic female, four are
white females, and two are white males.  Also noteworthy is that based on thirteen stores located
in Northern Indiana, six of these thirteen . . . stores have Human Resource Coordinators who are
African-American; a statistic Wilkerson most noticeably chose to avoid."  *Id*.

In summary, Menards argues that Wilkerson misrepresents her Exhibit D, the list of
Human Resource Coordinators employed by Menards, and is wrong about (or outright ignores)
the percentage of African-Americans employed as HRCs, at least in the Northern Indiana region
in which Wilkerson expressed interest in working.  The court agrees that this evidence does not
constitute direct evidence of discrimination and, as indirect evidence, does not represent the
disparity Wilkerson claims.  It is also worth noting that Wilkerson, by her own admission, did
not receive this document until *after* she filed this lawsuit and made discovery requests on
Menards.  Thus, she was completely unaware of the document at the time she willingly chose not
to send a copy of her resume and transcripts to Hilfiker after he invited her to do so.  In other

---

[9] Terri Jain is the "Manager of Menard, Inc.'s Payroll and Employment Office" at the
company's headquarters in Wisconsin.  Jain Affidavit, ¶ 1.  In the affidavit, Jain confirms that
each of the individuals hired into a Human Resource Coordinator position in the company's
northwest Indiana locations "submitted a copy of their academic transcript showing the college
or university attended and degree conferred."  *Id*., ¶ 5.  Jain also states that submission of
transcripts was a company requirement "for the Human Resource Coordinator position."  *Id*., ¶ 3.

words, any disparity that is indicated–or that even could be inferred–by the contents of this report did not have any impact on Wilkerson's decision not to apply for a job with Menards.

Wilkerson fails to present sufficient evidence to sustain her burden of establishing a *prima facie* case of discrimination under Title VII or § 1981. She has not made a showing that she applied for the Human Resource Coordinator position (or that she was excused from doing so pursuant to the *Teamsters* case and its progeny); she has not made a showing that she was rejected for that position or any other position; and she has failed to show that any individuals not in her protected class were treated more favorably. Even assuming she could meet that *prima facie* burden, she fails to present any evidence whatsoever that Menards' refusal to hire her or consider her for a position was based on anything other than her own failure to apply for a position (or, more to the point, to provide Hilfiker with the documentation he asked for in his letter). As stated, Wilkerson bases her lawsuit on nothing more than her own speculation, subjective beliefs, and/or unsupported conclusions that she was the victim of race discrimination. This is a classic example of the sort of "metaphysical doubt" about facts that is insufficient to withstand a properly supported motion for summary judgment. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**CONCLUSION**

For the reasons set forth in this Opinion and Order, the motion for summary judgment filed by the defendant, Menard, Inc., is GRANTED and this case is DISMISSED.

Entered: April 15, 2009.

  /s/   William C. Lee

William C. Lee, Judge
United States District Court
Northern District of Indiana
